UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

JENNIE PRATTS,

                                   Plaintiff                       DECISION AND ORDER

-vs-

                                                     14-CV-6176 CJS

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                                    Defendant.
_____

APPEARANCES

For the Plaintiff:              Howard D. Olinsky, Esq.
                               Olinsky Law Group
                               One Park Place
                               300 South State Street, Suite 420
                               Syracuse, New York 13202

For the Defendant:           Lauren Myers, Esq.
                               Special Assistant U.S. Attorney
                               Office of the United States Attorney
                               for the Western District of New York
                               c/o Social Security Administration
                               Office of General Counsel
                               26 Federal Plaza
                               New York, New York 10278

                               Kathryn L. Smith, A.U.S.A.
                               Office of the United States Attorney
                               for the Western District of New York
                               100 State Street, Room 620
                               Rochester, New York 14614

INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Jennie Pratts ("Plaintiff") for Social Security Disability

1

Insurance ("SSDI") benefits. Presently before the Court are the parties' cross-motions for judgment on the pleadings. (Docket Nos. [#8] & [#10]). Plaintiff's application is denied and Defendant's application is granted.

## VOCATIONAL HISTORY

At the time of the hearing Plaintiff, who was 55 years of age, had graduated from high school, completed two years of college (149) and worked at various jobs, including that of Account Manager with the Red Cross, Assistant Manager with CVS Pharmacy, Outside Sales Consultant for Sally Beauty Supply, Secretary at the University of Rochester, Customer Relations Manager at an auto dealership, and Claims Representative for Safeco Insurance. The ALJ found, and Plaintiff does not dispute, that Plaintiff acquired certain transferable skills from those jobs. (31, 34). Plaintiff's last employment ended on February 12, 2011, when she was terminated from her job with the Red Cross for reasons unrelated to her impairments. (15-18).

## PROCEDURAL HISTORY

On September 26, 2011 Plaintiff applied for SSDI benefits (121), claiming to be disabled due to "problems in both knees and legs," "arthritis of knees," "arthritis of legs" and "arthritis of shoulders." (148). At that time, Plaintiff described her condition as follows:

> Due to my arthritis in my knees and legs, it is very difficult and painful for me to walk, climb up and go down stairs. They get swollen every day and feel as though my knees will break and give way at times. I cannot stand in one position for any length of time or sit down too long without my knees, and legs and feet feeling tired, stiff, achy and sometimes numb. When I get up from sitting, I first have to wait a few seconds and position myself first before walking. I also have slight arthritis on my shoulders and cannot

lean/sleep on them because of the painful/rotator's cuff.

(156).  Later, Plaintiff expanded her claim to include carpal tunnel syndrome and low

back pain. Plaintiff claimed that she became unable to work on February 14, 2011. (148).

On October 26, 2011, Plaintiff completed a questionnaire for the Commissioner,

describing her activities of daily living.  Plaintiff indicated that she spent her days caring

for her infant granddaughter, including feeding the baby and changing diapers, shopping,

watching television, reading, doing "light" household chores, talking on the telephone,

emailing and visiting with friends in her home. (162, 165, 167).  Plaintiff indicated that

she had "no problem" caring for herself, except that she had difficulty blow drying,

straightening and curling her hair "in a timely fashion." (162).  Plaintiff indicated that she

cooked "quick" family meals on certain days, and that her husband helped with cooking

on other days. (163).  Plaintiff reported that she could do "some cleaning, some laundry,"

and ironing occasionally, but needed help with "lifting, carrying, bending down, pushing,

pulling, going up and down stairs." (164).  Plaintiff indicated that she was in "constant

pain," for which she took ibuprofen every four hours. (170).  Plaintiff further indicated that

she had asthma attacks due to "allergies," mostly in the Spring. (172).

On November 14, 2011, the Commissioner denied Plaintiff's application, finding,

in pertinent part, that Plaintiff's medical conditions did not prevent her from performing

her prior work as a "customer sales representative." (67).  Plaintiff appealed that

determination and requested a hearing before an Administrative Law Judge ("ALJ").

On April 16, 2013, Plaintiff appeared at her hearing before an ALJ, accompanied

by her husband. (9-43).  After the ALJ advised Plaintiff of her right to retain an attorney

and postpone the hearing, Plaintiff elected to proceed unrepresented.  Regarding her

activities of daily living, Plaintiff testified that she has a license and is able to drive.

Plaintiff also stated that in order to lose weight prior to knee surgery in June 2012, she

was able to use an elliptical exercise machine and participate in the Zumba exercise

program, though in a "low impact" manner. (24).  Plaintiff indicated, however, that she

eventually quit Zumba because of knee pain. (24).   Plaintiff further acknowledged that

after she stopped working, she provided daytime childcare for her granddaughter, "four

or five hours a day," for many months while her daughter worked. (14).  On this point,

Plaintiff testified that she provided such child care from January 2012 to April 2012 (14-

15), but she previously told others, including the Commissioner, that she was providing

such care as early as October 2011. (162).  The only other person to testify at the

hearing was the Vocational Expert ("VE").

At the close of the hearing, the ALJ kept the record open to allow Plaintiff to

submit additional exhibits, which she did. (48).  The Court will briefly summarize Plaintiff's

medical records below.

On October 27, 2008, Plaintiff informed Aitezaz Ahmed, M.D. ("Ahmed") that she

had experienced pain in her knees "for the past two years," and "occasional" pain in her

shoulders and feet, but no joint swelling or prolonged joint stiffness in the mornings.

(214).  Upon examination, Ahmed reported normal neurologic responses, tenderness in

the right hand, left wrist and both feet, and crepitus, tenderness and varus deformity in

both knees. (216).  Ahmed observed no rashes. (216).  Ahmed reported that Plaintiff had

a positive ANA Test and "arthralgias," but doubted that she had lupus or rheumatoid

arthritis. (217).  Ahmed noted that osteoarthritis was contributing to Plaintiff's pain, and

recommended that she pursue physical therapy. (217).  Ahmed further advised Plaintiff to have additional lab testing and x-rays. (217, 219).

On June 12, 2009, Plaintiff visited her primary care physician, Stefenie King, M.D. ("King"). (239-241).  King reported that Plaintiff was complaining of allergy symptoms, but was "otherwise doing well." (239).  King observed "no bone/joint pain or swelling," but noted that Plaintiff took ibuprofen, "3 tabs daily for joint pain." (240).

On June 18, 2009, Ahmed saw Plaintiff for a follow-up appointment, and noted that she had not followed his recommendation to have additional blood tests, x-rays or physical therapy.(219).  Plaintiff reported that she still had pain in her "knees and feet" that was worse with activity, and for which ibuprofen provided "partial relief." (219).  Upon examination, Ahmed observed tenderness in the right hand and both feet, and tenderness, crepitus and varus deformity of both knees. (219).  Ahmed gave Plaintiff injections of Depo Medrol and lidocaine in her knees. (218).

On June 16, 2010, King noted that Plaintiff was complaining of a sinusitis and nasal allergy symptoms. (234).  King observed "no bone/joint pain or swelling. No weakness." (235).

On September 29, 2010, King reported that Plaintiff was complaining of pain in her knees, and that an orthopedic specialist, Robert Little, M.D. ("Little"), had given Plaintiff cortisone shots in the knees, which "didn't help much." (230).  King stated, though, that Plaintiff was able to exercise using her pool and elliptical machine, which did "not bother her knees." (230).  Plaintiff reportedly told King that her allergies and eczema were bothering her. (230).  Under the section of her office notes entitled "Musculoskeletal," King indicated, apparently based on Plaintiff's statements: "Positive

for back pain, bone and joint symptoms and myalgias." (231).  However, King stated that her own physical examination revealed "normal musculature.  No skeletal tenderness or joint deformity." (232).

On November 2, 2011, Karl Eurenius, M.D. ("Eurenius"), a non-treating, consultative specialist in internal medicine retained by the Commissioner, examined Plaintiff. (251-257).  Eurenius noted that Plaintiff was complaining of arthritis in her knees, toes and shoulders, as well as allergies and eczema. (251).  Plaintiff reportedly told Eurenius that she had been experiencing knee pain for ten years, "particularly with walking, standing on her toes, and going up or down stairs." (251).  Plaintiff stated that she felt shoulder pain when she tried to sleep on her right side or perform "heavy lifting" with her right arm. (251).  Plaintiff indicated that she used "lotions" to treat her eczema. (251).  Eurenius reported Plaintiff's activities of daily living as follows:

> She cooks twice a week, but her husband helps her.  She does light cleaning.  She does laundry once a week, but no heavy lifting.  She does shopping once a week, but no heavy lifting, and she does light child care two to three times a week.  She watches TV, listens to the radio, reads and shops.

(252).  Eurenius performed a physical examination and stated that due to knee pain, Plaintiff had difficulty standing on her toes and squatting, but that otherwise her "general appearance, gait and station" were essentially normal. (252).  Eurenius further stated that Plaintiff had evidence of "healed" eczema rashes on her hands and lower legs. (252-253).  As for his musculoskeletal examination, Eurenius stated that Plaintiff had some pain and tenderness in her lower back with certain movements, and some pain in her right shoulder "with full elevation," but had full hand grip strength and intact hand and

6

finger dexterity. (253-254).  With regard to Plaintiff's knees, Eurenius stated: "Both knees appear chronically swollen without signs of acute inflammation.  There is mild tenderness on either side of the patella in each knee.  There are no other signs of contractures, ankylosis, or thickening." (254).  Eurenius' medical source statement was as follows:

> In my opinion she is limited in recurring lifting or carrying with her right shoulder and with her right arm due to arthritis of the right shoulder with pain.  She is also limited in walking more than 100 yards, climbing or descending more than four or five stairs due to chronic arthritis  with pain in the knees.

(254).

On November 8, 2011, David Paniccia, RPA ("Paniccia"), who is a Physician's Assistant to Dr. Little, reported that Plaintiff was complaining of "increasing pain" in her knees during the previous "6-8 months," resulting from "weightbearing and walking." (266).  Paniccia examined Plaintiff and reported that "both knees show a varus [bowlegged] position," and that Plaintiff was "tender along the medial compartments of both knees." (267).  However, Plaintiff had a "slow steady gait" and was able to get on and off the exam table without difficulty. (267).  X-rays of Plaintiff's knees showed "severe medial compartments joint space narrowing bilaterally" and "mild osteophyte formations with mild to moderate patellofemoral degenerative changes." (267).  Paniccia's impression was "bilateral knee [degenerative joint disease]." (267).  Paniccia provided Plaintiff with cortisone injections in the knees, and indicated that knee replacement surgery might be advisable if the injections did not help. (267).

On November 16, 2011, following an office visit, King reported that Plaintiff was "doing well overall," trying to lose weight and "trying to exercise (Zumba)." (258).  Plaintiff

indicated that she had just gotten "steroid injections" in her knees a few days earlier, and requested that King prescribe further physical therapy, because previous physical therapy had been "helpful for her bilateral shoulder, elbow, ankle and toe pain." (258). King's physical examination of Plaintiff was "positive for back pain and joint pain," but "negative for joint swelling, muscle weakness and neck pain." (259).  Under the heading "musculoskeletal," King further stated: "Normal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (260).

On December 14, 2011, Plaintiff reportedly told Paniccia that the cortisone injections had only helped her knees for a few days, and that she was continuing to have pain with "weightbearing and walking." (270).  Paniccia again reported that Plaintiff's knees were "tender along the medial compartments," with no instability. (271).  Paniccia opined that conservative treatment for Plaintiff's "severe" knee arthritis had failed, and that she should therefore speak to Dr. Little about knee replacement surgery. (271, 279).

In June 2012, Plaintiff had surgery to replace her left knee joint. (297).

On October 31, 2012, King signed Plaintiff's application for a "handicap parking permit," and checked boxes on the form indicating that Plaintiff had a "permanent disability," namely "severe [degenerative joint disorder]," and was "unable to walk 200 ft. without stopping," and that she was "severely limited in ability to walk due to an arthritic, neurological or orthopedic condition." (283).

On March 15, 2013, King examined Plaintiff for complaints of "low back pain, hands falling asleep." (284).  King's impression, in pertinent part, was "acute carpal

tunnel syndrome" and "acute lumbago," *i.e.*, low back pain.[1] (284).   For the carpal tunnel syndrome, King recommended an initial "trial of exercises and bracing," to see if the condition would improve. (284).   King indicated that if such conservative treatment failed, Plaintiff should see a hand surgeon, Jeffrey Fink, M.D. ("Fink"). (284).   For the lumbago, King recommended physical therapy and "core strengthening exercises." (284).

On March 29, 2013, King provided Plaintiff with a doctor's note, indicating that Plaintiff should be excused from jury duty during the next eighteen months, since she was "unable to sit or stand for longer than 15 minutes without having to change position." (282).

On August 16, 2013, the ALJ issued his Decision, denying Plaintiff's application for SSDI benefits. (48-58).   In that regard the ALJ applied the familiar five-step sequential analysis for disability claims, which is set forth later in this Decision and Order.   At step one of the analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 14, 2011. (50).   At step two, the ALJ found that Plaintiff has the following severe impairments: "allergic asthma; back disorder; bilateral degenerative joint disease; osteoarthritis; carpal tunnel syndrome; and obesity." (50).   At step three of the analysis, the ALJ found that none of Plaintiff's impairments met or equaled a listed impairment. (51).   Prior to reaching step four of the analysis, the ALJ made the following residual functional capacity ("RFC") finding:

> [C]laimant has the residual functional capacity to perform sedentary work . . . except she would only occasionally be able to operate foot controls.   She

[1]According to the Encyclopaedia Brittanica, "Lumbago is considered by health professionals to be an antiquated term that designates nothing more than lower back pain caused by any of a number of underlying conditions." http://www.britannica.com/science/lumbago

would only occasionally be able to climb ramps and stairs, never climb
ladders, ropes or scaffolds, and only occasionally stoop.  She would never
be able to work around unprotected heights.  She would only occasionally
be able to work around atmospheric conditions, such as dust, fumes and
gases.  She would require a hand held assistive device [cane] when
ambulating on uneven terrain and distances over 100 feet.  She would
never be able to kneel, crouch, or crawl.  She would require a sit/stand
option to change positions every 15 minutes.  She would only frequently be
able to finger and handle.

(51).  At step four of the sequential analysis, the ALJ found, based on the testimony of

the VE, that Plaintiff would not be able to perform any of her past relevant work. (55-56).

However, at step five of the analysis, the ALJ found, again based on the VE's testimony,

that Plaintiff can perform other work, including the following jobs: "appointment clerk,"

DOT 237.367-010, "information clerk," DOT 237.367-022, and "clerk typist," DOT

203.362-010. (57-58). In making this determination, the ALJ indicated that he had

considered the pertinent regulations, including the regulations for weighing medical

evidence and regulations for evaluating a claimant's credibility. (51).

On August 26, 2013, Plaintiff requested review by the Appeals Council.  In

connection with the appeal, approximately eight months after the hearing, in December

2013, Plaintiff submitted new evidence from Dr. King. (Exhibit 11F).  Specifically, on

December 10, 2013, King had filled out a form disability report for the Monroe County

Department of Human Services. (297-298).  King listed Plaintiff's medical conditions as

bilateral knee pain [bilateral] with joint replacement surgeries,[2] "low back pain," "carpal

tunnel syndrome" for which she was being treated by another doctor, and

---

[2]On November 12, 2013, Plaintiff had surgery to replace her right knee joint. (297).

"depression/anxiety." (297).[3]  King offered no explanation for the diagnosis of

"depression/anxiety." (297).  In any event, with regard to physical limitations, King

indicated that Plaintiff was "very limited" with regard to walking, standing, lifting, carrying,

pushing, pulling, bending, using hands, and climbing stairs, and was "moderately limited"

with regard to sitting. (297).  With regard to "mental functioning," King indicated that

Plaintiff had no limitations, except a moderate limitation in being able to function in a

work setting at a consistent pace. (297).  Notably, King's statement does not indicate the

expected duration of Plaintiff's impairments, other than to say that they were expected to

last more than ninety days.  In that regard, King issued this report only one month after

Plaintiff's second knee replacement surgery (right knee) and included the statement, "It

would be difficult for [patient] to work at this time given her current disabilities." (298).

Moreover, King checked a box indicating that Plaintiff's restrictions were "expected to last

longer than 90 days," but did not check the box indicating that Plaintiff had "a severe

impairment(s) which has lasted, or is expected to last at least 12 months." (298).

On February 24, 2014, the Appeals Council denied Plaintiff's request for review.

(1-5).  In that regard, the Appeals Council acknowledged receiving King's report, but

nevertheless indicated that it found "no reason under our rules to review the [ALJ's]

decision." (1, 4-5).

On April 14, 2014, Plaintiff, now represented by counsel, commenced this action.

On October 14, 2014, Plaintiff filed her motion [#8] for judgment on the pleadings, raising

essentially the following arguments: 1) the ALJ's RFC finding is not supported by

---

[3]Apparently with regard to the alleged "depression/anxiety," King indicated that she was
recommending that Plaintiff go to "English Road Psychotherapy" for "therapy." (298).

11

substantial evidence, since he (a) failed to consider Plaintiff's shoulder arthritis in formulating the RFC, (b) failed to factor Plaintiff's back pain into the RFC, (c) failed to properly account for Plaintiff's carpal tunnel syndrome in the RFC, and (d) failed to factor Plaintiff's non-severe eczema into the RFC;  2) the ALJ failed to consider and weight the opinion of "Dr. Kosty"; 3) the ALJ's credibility determination is not supported by substantial evidence; and 4) the ALJ's step-five determination is unsupported by substantial evidence, since it is based on flawed RFC  and credibility findings.

On January 14, 2015, Defendant filed her cross-motion [#10] for judgment on the pleadings.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA

12

considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 404.1527(c)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(c)(4), formerly designated as 20 C.F.R. § 404.1527(d)(4)). Nevertheless,

[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527[(c)](2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of

13

> determination or decision for the weight [she] give[s] [claimant's] treating
> source's opinion.' *Id.*; *accord* 20 C.F.R. § 416.927[(c)](2); *see also Schaal*,
> 134 F.3d at 503-504 (stating that the Commissioner must provide a
> claimant with "good reasons" for the lack of weight attributed to a treating
> physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  An ALJ, though, is not required to

explicitly discuss each such factor, as long as his "reasoning and adherence to the

regulation are clear." *Atwater v. Astrue*, 512 Fed. Appx. 67, 70, 2013 WL 628072 at *2

(2d Cir. Feb. 21, 2013) ("Atwater challenges the ALJ's failure to review explicitly each

factor provided in 20 C.F.R. § 404.1527(c). We require no such slavish recitation of each

and every factor where the ALJ's reasoning and adherence to the regulation are clear.")

(citation omitted).

Administrative Law Judges are required to evaluate a claimant's credibility

according to the factors set forth in the Commissioner's regulations, which state, in

relevant part:

> In determining whether you are disabled, we consider all your symptoms,
> including pain, and the extent to which your symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence. By objective medical evidence, we mean medical signs and
> laboratory findings as defined in § 404.1528 (b) and (c). By other evidence,
> we mean the kinds of evidence described in §§ 404.1512(b)(2) through (8)
> and 404.1513(b)(1), (4), and (5), and (d). These include statements or
> reports from you, your treating or nontreating source, and others about your
> medical history, diagnosis, prescribed treatment, daily activities, efforts to
> work, and any other evidence showing how your impairment(s) and any
> related symptoms affect your ability to work. We will consider all of your
> statements about your symptoms, such as pain, and any description you,
> your treating source or nontreating source, or other persons may provide
> about how the symptoms affect your activities of daily living and your ability
> to work.

***

14

In evaluating the intensity and persistence of your symptoms, including
pain, we will consider all of the available evidence, including your medical
history, the medical signs and laboratory findings and statements about
how your symptoms affect you. (Section 404.1527 explains how we
consider opinions of your treating source and other medical opinions on the
existence and severity of your symptoms, such as pain.) We will then
determine the extent to which your alleged functional limitations and
restrictions due to pain or other symptoms can reasonably be accepted as
consistent with the medical signs and laboratory findings and other
evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

Factors relevant to your symptoms, such as pain, which we will consider
include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other
symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you
take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief
of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other
symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every
hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due
to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).  However, while an ALJ is

required to consider these factors, he is not required to explicitly discuss each one. *See,*

*Pellam v. Astrue*, 508 Fed.Appx. 87, 91, 2013 WL 309998 at *3 (2d Cir. Jan. 28, 2013)

("The ALJ did not apply an incorrect legal standard when judging the credibility of

Pellam's testimony. Although the ALJ did not explicitly discuss all of the relevant factors,

Pellam has failed to point to any authority requiring him to do so. In any event, the ALJ

cited the applicable regulation, 20 C.F.R. § 404.1529, explicitly mentioned some of the regulatory factors (such as Pellam's limited use of pain medication), and stated that he considered all of the evidence required by § 404.1529."). If it appears that the ALJ considered the proper factors, his credibility determination will be upheld if it is supported by substantial evidence in the record. *Id*.

DISCUSSION

*The RFC Determination Takes Into Account Plaintiff's Shoulder Arthritis*

Plaintiff maintains that the ALJ's RFC determination ignores her shoulder arthritis, stating, "the RFC only reflects the disease in Plaintiff's knees and fails to reflect its presence in Plaintiff's right shoulder."[4] However, Defendant contends that the ALJ considered such condition when he limited Plaintiff to less than a full range of sedentary work.

The Court agrees with Defendant, since it is evident that the ALJ credited Plaintiff's complaints of shoulder pain and Dr. Eurenius's opinion that Plaintiff was limited in her ability to lift and carry due to such condition. For example, the ALJ expressly indicated that Plaintiff's complaints of pain in her shoulders were credible to an extent, and that they, along with her complaints of knee pain and foot pain, resulted in her being "greatly limited." (52) ("The claimant has some credible exertional, postural, and environmental limitations due to pain in her knees, shoulders and feet. Accordingly, I have limited her greatly in these areas."). Moreover, the ALJ referenced Eurenius's opinion that Plaintiff "is limited in recurrent lifting or carrying with her right shoulder and

---

[4]Docket No. [#8-1] at p. 10.

with her right arm due to arthritis of the right shoulder with pain"(53), and stated that he was giving "great weight" to such opinion, and "adopting" it in making the RFC determination. (55) ("[H]is opinion is adopted in the residual functional capacity determined herein.").  Further, the ALJ limited Plaintiff to less than a full range of sedentary work, the lowest exertional category, involving "lifting no more than 10 pounds at a time" and only "occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a).  Accordingly, Plaintiff's contention that the ALJ's RFC determination "fails to reflect" her shoulder impairment lacks merit.

*The RFC Determination Takes Into Account  Plaintiff's Back Pain*

Plaintiff next contends that the ALJ failed to account for her back impairment when formulating the RFC, even though he included it as a severe impairment. (Docket No. [#8-1] at p. 12) ("[T]he ALJ recognized Plaintiff's back pain as a severe impairment [but] refused to recognize its impact on Plaintiff's ability to work.").  More specifically, Plaintiff maintains that the RFC should have included some type of "bending or other limitations related to Plaintiff's back pain."[5]  However, Defendant maintains that the RFC adequately addressed Plaintiff's physical complaints, and that additional restrictions were not warranted in light of the relatively mild nature of Plaintiff's back ailment.

The Court agrees with Defendant that the ALJ intended his selection of the sedentary exertion level to accommodate Plaintiff's back ailment, even though it was primarily selected based upon Plaintiff's other conditions, such as her knees and shoulder, which the ALJ felt were more severe in terms of their effects.  More specifically,

_____

[5]Docket No. [#8-1] at p. 12.

the ALJ's RFC analysis is primarily focused on a detailed discussion of Plaintiff's pain in her "knees, shoulders and feet." (52-53).  The ALJ went on to state that Plaintiff had "some credible exertional and postural limitations due to back pain," but that "further limitations [beyond those contained in his RFC finding were not] warranted," since his RFC determination, limiting Plaintiff to less than a full range of sedentary work, was already sufficient to take into account any limitations caused by her back pain. (54).  In that regard, the ALJ stated that it was "questionable" whether Plaintiff's back disorder "caused more than minimal functional limitations." (51).  The Court finds that the RFC determination on this point is supported by substantial evidence.

> *The RFC Determination As To Carpal Tunnel Syndrom Is Supported*
> *By Substantial Evidence*

Similar to her prior two arguments, Plaintiff next maintains that the ALJ failed to account for her carpal tunnel syndrom when he made his RFC determination.  On this point, Plaintiff notes, for example, that her carpal tunnel syndrome was significant, since, for example, Dr. Ahmed twice ordered x-rays of her wrists, and Dr. King "referred [her] to Dr. Fink, a hand surgeon."[6]  Consequently, Plaintiff argues, "the ALJ's finding of [her] ability to frequently finger and handle is an error and does not properly reflect the medical evidence."[7]   However, Defendant responds that the ALJ discussed Plaintiff's carpal tunnel syndrome, and that his RFC determination on this point is supported by substantial evidence.

The Court again agrees with Defendant that the  ALJ's RFC determination is

---

[6]Docket No. [#8-1] at p. 13.

[7]Docket No. [#8-1] at p. 13.

supported by substantial evidence.  At the outset, the fact that Dr. Ahmed twice ordered

x-rays of Plaintiff's hands is not really evidence of how serious the condition was, since

Plaintiff apparently failed to follow through and obtain the x-rays either time.(219) ("She

did not go for blood tests and x-rays as previously recommended.  She did not go for

physical therapy as previously advised.").  Moreover, Dr. King indicated that Plaintiff

should go and see the hand surgeon, Dr. Fink, only if conservative attempts to treat her

carpal tunnel syndrome failed (284), and there is no indication that it did.  Indeed, King's

office notes provide no follow-up information and, therefore, little or no support for her

opinion, set forth in her post-hearing, December 2013 report, that Plaintiff was "very

limited" in her ability to use her hands. (297).[8]  Nevertheless, the ALJ credited Plaintiff's

complaints about her carpal tunnel syndrome to an extent. (54) ("The claimant has some

credible manipulative limitations due to pain in her hands.").  However, the ALJ observed

that Plaintiff's doctors said very little about carpal tunnel syndrome, while Eurenius, who

is apparently the only doctor to perform objective testing on this point, found that Plaintiff

had intact hand and finger dexterity and full grip strength. (54).  Consequently, the ALJ

determined that his RFC finding, which in order to give Plaintiff the benefit of the doubt

(51) included a limitation on fingering and handling, accurately addressed Plaintiff's

carpal tunnel syndrome, without the need for any "additional limitations." (54).  The Court

finds that such determination was supported by substantial evidence.

---

[8]King's December 2013 report appears to indicate that Plaintiff was seeing a "Dr. Khishchenko" for her carpal tunnel syndrome, but there are no records from such a doctor and Plaintiff  has not raised that point.

### *Plaintiff's Argument Regarding Eczema Rashes Lacks Merit*

Plaintiff next contends that the ALJ's RFC determination was erroneous, since it didn't "even mention" rashes on Plaintiff's hands and face.[9]  However, the Court disagrees, since there is no indication from anyone that Plaintiff's eczema had any effect on her ability to work.  For example, Dr. King's report from December 2013, which was expressly intended to list "all medical conditions" preventing Plaintiff from working, does not even mention eczema in the body of the report (297-298), though an attached list of medications notes that Plaintiff uses a "topical ointment" for eczema.  Nevertheless, the ALJ mentioned Plaintiff's eczema, but observed that according to Eurenius the condition was "in control." (52).  The ALJ's RFC determination is supported by substantial evidence, and Plaintiff's argument on this point lacks merit.

### *The ALJ Was Not Required to Discuss the Report by Analyst K. Kosty*

Plaintiff further contends that the ALJ erred by failing to "evaluate every medical opinion he receives," as required by 20 C.F.R. § 416.927(c), since he "failed to evaluate or even acknowledge the opinion of Dr. Kosty."[10]  However, the Court can quickly dispose of this objection, since as Defendant correctly points out, "K. Kosty," who completed a residual functional capacity assessment for the commissioner, is a disability analyst, not a doctor. (159, 226).  In that regard, ALJs are not required to assign weight to the opinion of a disability analyst. *See, Bush v. Colvin*, No. 5:13–CV–994 (MAD/ATB), 2015 WL 224764 at *11, n.15 (N.D.N.Y. Jan. 15, 2015) ("Opinions of a disability analyst, who has

---

[9]Docket No. [#8-1] at p. 14.

[10]Docket No. [#8-1] at pp. 16-18.

no medical training, are not entitled to evaluation as medical opinions.") (*quoting Zongos v. Colvin*, No. 12–CV–1007, 2014 WL 788791, at *11 n. 21 (N.D.N.Y. Feb. 25, 2014); *see also*, *Miller v. Astrue*, No. 3:07–CV–1093 (LEK/VEB), 2009 WL 2568571 at *10 (N.D.N.Y. Aug. 19, 2009)("The Court notes that the form Plaintiff refers to was completed by the Social Security disability analyst. Therefore the ALJ was not required to assign weight to the opinion, nor should the ALJ prefer such an opinion over Plaintiff's treating physician.").  Plaintiff's argument on this point therefore lacks merit.

### Plaintiff Has Not Shown How the ALJ's Credibility Finding is Erroneous

Next, Plaintiff maintains that the ALJ's credibility determination is unsupported by substantial evidence, because he "erred in considering the required factors." (Docket No. [#8-1] at p. 18).  Plaintiff's somewhat cursory argument on this point seems to contend that the ALJ failed to explicitly discuss each of the factors set forth in 20 C.F.R. § 404.1529(c)(3).  Defendant responds that, "Plaintiff does not identify any particular errors with the credibility analysis." (Docket No. [#10-1] at p. 16).

Social Security Ruling 96-7p indicates that an ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." 1996 WL 374186 at *2 (Jul. 2, 1996).  However, as already stated above, although an ALJ is required to consider all of the required credibility factors, he is not required to explicitly discuss each one. *See, Cichocki v. Astrue*, 534 Fed.Appx. 71, 76 (2d Cir. Sep. 5, 2013) ("While the ALJ did not discuss all seven factors

listed in 20 C.F.R. § 416.929(c)(3), he provided specific reasons for his credibility determination[.]").  Accordingly, to the extent that Plaintiff's argument is based on the ALJ's failure to explicitly discuss each factor under 20 C.F.R. § 404.1529(c)(3), it lacks merit.

Although Plaintiff has not identified any other error on this point, the Court has reviewed the ALJ's credibility determination and finds that it is supported by substantial evidence.  In that regard, the ALJ expressly stated that he had considered all of Plaintiff's symptoms as required by, *inter alia*, 20 CFR 404.1529 and SSR 96-7p. (51).  Further, the ALJ listed various reasons why he questioned Plaintiff's statements about the severity of her symptoms, such as the fact that she "was not entirely forthcoming [about] her part-time work as a childcare provider for her grandchild," and that she seemed to believe that she was disabled because she could not presently "earn the same amount as in her past work." (55).  Additionally, the ALJ noted that Plaintiff was non-compliant with her doctor's treatment recommendations at times, and that she was able to engage in exercise and other activities of daily living. (53, 54).

### *Plaintiff Has Not Shown That the ALJ Erred at Step Five*

Lastly, Plaintiff contends that the ALJ's finding at Step Five of the Sequential Analysis was flawed, because it was based on an erroneous RFC determination and an erroneous credibility determination.  Essentially, Plaintiff argues that the VE's testimony concerning Plaintiff's ability to perform other jobs was flawed because it was based on an incorrect RFC. (Docket No. [#8-1] at p. 18) ("[The VE's] testimony cannot provide substantial evidence to support the ALJ's decision because it was based upon an incomplete and unsupported hypothetical question.").  Defendant responds that the ALJ's

finding at Step Five is supported by substantial evidence.

The Court finds that Plaintiff's contention on this point lacks merit since, for the most part, it is based on the same arguments, concerning the ALJ's RFC and credibility findings, that the Court has already discussed and rejected.  Plaintiff makes an additional argument, regarding transferability of skills, but it is too vague to require reversal.  In that regard, Plaintiff asserts that "the transferability analysis is flawed, due to the ALJ's failure to consider the limitations of all of Plaintiff's severe impairments and [to] evaluate all the medical opinions provided in the record," but does not identify any particular "limitations" or "medical opinions" that the ALJ failed to consider or evaluate, apart from those already discussed.  Accordingly, this argument also lacks merit.

CONCLUSION

Defendant's motion for judgment on the pleadings [#10] is granted and Plaintiff's motion [#8] for judgment on the pleadings is denied.  The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
       July 14, 2015

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge